# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01100-COA

AUSTIN WIGLEY A/K/A AUSTIN Z. WIGLEY                    APPELLANT

v.

STATE OF MISSISSIPPI                                    APPELLEE

DATE OF JUDGMENT:              09/07/2023
TRIAL JUDGE:                   HON. TONI DEMETRESSE TERRETT
COURT FROM WHICH APPEALED:     WARREN COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:        OFFICE OF STATE PUBLIC DEFENDER
                               BY: AMBER LAUREN STEWART
ATTORNEY FOR APPELLEE:         OFFICE OF THE ATTORNEY GENERAL
                               BY: ALLISON ELIZABETH HORNE
DISTRICT ATTORNEY:             RICHARD EARL SMITH JR.
NATURE OF THE CASE:            CRIMINAL - FELONY
DISPOSITION:                   AFFIRMED - 08/26/2025
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., McCARTY AND WEDDLE, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1.     A Warren County grand jury jointly indicted Austin Wigley and Zoie Cantin for one count of felonious child abuse related to injuries sustained by their infant son Reeves.[1] After Wigley's trial on the indicted count, a Warren County Circuit Court jury convicted Wigley of felony child abuse. The Warren County Circuit Court then sentenced Wigley to forty years in the custody of the Mississippi Department of Corrections (MDOC), with twenty-five years to serve and fifteen years suspended, and five years of post-release supervision. On appeal, Wigley argues that the State presented insufficient evidence to support his conviction

---

[1] We use pseudonyms for the minor children involved in this matter.

and that his trial attorney rendered ineffective assistance of counsel. Finding no reversible error, we affirm Wigley's conviction and sentence.

**FACTS**

¶2. Wigley and Cantin resided in Biloxi, Mississippi, with Reeves and Natalie, Cantin's daughter from a previous relationship. On Friday, July 23, 2021, Wigley and Cantin traveled to Vicksburg, Mississippi, and stayed with Cantin's stepfather, Tim Wright. The following night, on Saturday, July 24, 2021, Natalie spent the night with Cantin's grandmother, Paula Pepper. In an effort to arrange a date night for herself and Wigley, Cantin called Wright's neighbor, Kristy Brock, to see if Brock could babysit Reeves for a few hours.

¶3. At Wigley's trial, Brock explained that she lived about two homes down from Wright and helped manage the mobile-home park where they both lived. Brock described Wright as a "[v]ery sweet man" who "was a double[-]leg amputee confined to a wheelchair . . . ." Due to Wright's physical limitations, Brock sometimes assisted Wright with getting his groceries and with other tasks. As a result, Brock was familiar with the layout of Wright's mobile home. Brock explained that Wright "could access his bedroom and the bathroom because [those rooms] had modified . . . doors" that accommodated his wheelchair. Notably, however, Brock testified that Wright was unable to access other areas of his home such as the porch and the second bedroom, where Wigley and Cantin stayed during their visit.

¶4. Although Cantin had previously asked Brock to babysit Natalie, the evening of July 24, 2021, was the first time Cantin had asked Brock to watch Reeves. Brock agreed to

2

babysit Reeves, who was about seven weeks old, but she asked that Cantin pick up Reeves by midnight. Wigley and Cantin dropped off Reeves at Brock's home around 9 p.m. Brock testified that she bathed Reeves and gave him a bottle. Brock stated that she noticed no issues with Reeves as she bathed and fed him. Instead, Brock described Reeves as a "[s]weet baby" who was "[n]o problem at all." Brock testified that when Wigley and Cantin arrived just after midnight to pick up Reeves, he was asleep. Brock stated that she had no further interactions with Wigley, Cantin, or Reeves after they left her home.

¶5.    Cantin similarly testified that Reeves was asleep and appeared "[p]erfectly fine" when she and Wigley picked him up from Brock's home. After returning to Wright's home, Cantin stated that she took a shower, and then she, Wigley, and Reeves all went to sleep in the same bed. The next morning, on July 25, 2021, Cantin's grandmother, Pepper, called to remind Cantin to pick up Natalie before Pepper needed to leave for church. Pepper testified that during the phone call with Cantin, she heard no background noises, such as a baby crying. Shortly after Pepper's phone call, Cantin got ready to drive to Pepper's home, which was about ten minutes away from Wright's home. Cantin testified that when she left Wright's home, Wigley was awake and sitting in bed while Reeves still slept. Cantin stated that although Wright was also inside the home, he was in the kitchen.

¶6.    Both Cantin and Pepper testified that Cantin was getting ready to return to Wright's home with Natalie when Wigley called her. According to Cantin, Wigley told her that Reeves kept screaming and that he had tried everything he could do to calm Reeves. Pepper

3

similarly testified that Wigley, who was speaking loudly enough for her to overhear him, told Cantin that Reeves was screaming and would not be quiet.

¶7.    Cantin informed Wigley that she was about to drive back to Wright's home with Natalie. While Cantin was getting Natalie into her vehicle, Wigley called a second time to tell her that Reeves was still screaming and would not calm down. Cantin testified that she then called Wright, who told her that "he couldn't get in the bedroom but that all he heard was the baby screaming." Wright also told Cantin that he and Wigley had heated up a bottle so Wigley could try to feed Reeves but that Reeves did not want to eat anything.

¶8.    Cantin stated that after she arrived back at Wright's home, she could hear Reeves screaming from where she stood outside. As she entered the bedroom she had shared the night before with Wigley and Reeves, Cantin saw Reeves lying on the bed with a swollen arm. She stated that Wigley, who was sitting on the bed beside Reeves, was smoking a cigarette and trying to give Reeves a bottle. Cantin attempted to dress Reeves, but the outfit would not go over Reeves's swollen arm.

¶9.    Cantin then called Pepper to ask if Natalie could return to Pepper's home. When Wigley and Cantin arrived, Pepper was waiting in her driveway with her sister, Debbie, and a friend from church. Pepper testified that Reeves "was screaming his head off" as Wigley and Cantin parked in her driveway. Upon seeing Reeves's swollen arm, Pepper's church friend remarked that Reeves appeared to have a broken arm and should be taken to the emergency room. After leaving Natalie in Debbie's care, Cantin and Wigley drove Reeves

4

to the local hospital.

¶10.    Hospital personnel determined that Reeves had suffered an arm fracture. Lieutenant Stacy Rollison with the Warren County Sheriff's Office arrived at the hospital to interview Wigley and Cantin about Reeves's injury. Cantin initially stated that she was not sure how Reeves's arm had been injured, but she later provided Lieutenant Rollison with several inconsistent explanations as to how the arm fracture could have occurred. Following a forensic investigation by hospital personnel, Lieutenant Rollison received a detailed report concluding that Reeves's arm fracture had resulted from child abuse. The report stated that the arm fracture was recent and had occurred during the time the family had been in Warren County. The report further stated that Reeves had sustained multiple other injuries that were in the process of healing.

¶11.    Following his initial examination at the local hospital, Reeves was transported by ambulance to Children's of Mississippi, the pediatric hospital in Jackson, Mississippi. Due to concern regarding the cause of Reeves's arm injury, the trauma surgery team contacted Dr. Rosalyn Brownlee to perform a forensic medical examination on Reeves. Dr. Brownlee worked at Children's Safe Center, a clinic that examined children who were suspected victims of abuse.

¶12.    At Wigley's trial, the circuit court accepted Dr. Brownlee as an expert in forensic pediatrics and child abuse without any objection from the defense. Dr. Brownlee testified that she examined Reeves and reviewed his medical records. The medical records showed

5

that as of July 20, 2021, which was only a few days before Cantin and Wigley traveled to Vicksburg, Reeves's extremities, including his arms, appeared to have no mobility issues. Dr. Brownlee described the arm injury she examined in Reeves as an "oblique fracture" caused by an "axial load with a rotation" or "a force into the bone and a twist." Dr. Brownlee stated that in children such as toddlers, who are mobile, an oblique fracture could be caused when a child tries to catch himself during a fall and twists his arm in the process. As Dr. Brownlee noted, however, Reeves, who was only seven weeks old at the time of his injury, was not yet mobile.

¶13. According to Dr. Brownlee, children's bones begin the healing process fairly quickly, with the "average" time being within "7 to 10 days" of the injury. Dr. Brownlee explained that at the time of Reeves's x-ray on July 25, 2021, his fractured arm showed no healing because the break was so recent. By contrast, Dr. Brownlee stated that she did "see some of that healing present" when Reeves had another x-ray performed about one week later on August 3, 2025.

¶14. Dr. Brownlee testified that in addition to Reeves's fractured arm, he "had numerous broken bones over time." Specifically, she found that Reeves had experienced over twenty broken bones. In reviewing Reeves's x-rays with a pediatric radiologist, Dr. Brownlee and the pediatric radiologist discovered Reeves had sustained at least twelve fractured ribs that had reached three different stages of the healing process. Dr. Brownlee testified that Reeves suffered a recently fractured front left rib, which appeared to have occurred within the last

6

seven to ten days; six fractured ribs on his front right side, which appeared to be two to six weeks old; and multiple fractured posterior ribs, which appeared to be over six weeks old and almost fully healed.

¶15.    Dr. Brownlee acknowledged that while "kids break bones[,]" "nonmobile children [such as Reeves] generally require a third party to break their bones . . . ." She further testified as follows:

> Rib fractures come from either a direct blow to the chest or a severe squeezing of the chest such . . . that the bands break. And actually posterior ribs are the most specific of rib fractures because the vertebra is involved. The chest is squeezed so hard that the bone itself actually breaks part of the other bone. That is not seen in CPR. So when you think about interventions medically that we have x-rays before, after, and over time, even that type of chest pressure does not do this. This is severe squeezing of the chest or a direct blow to the chest. And so rib fractures in isolation are very specific for abuse in [Reeves's] age group.

¶16.    Dr. Brownlee next testified that Reeves had multiple corner fractures in various stages of healing along his right leg. She stated that corner fractures occur when an extremity experiences trauma through a jerking or pulling motion. Dr. Brownlee further stated that "[c]orner fractures are the most specific fracture in infancy for . . . physical abuse" in children and "[a]re exceptionally rare in non-abusive events." In addition to the corner fractures, Reeves had multiple buckle fractures in both legs. Dr. Brownlee explained that a buckle fracture occurs when a bone buckles in (or collapses). She stated that buckle fractures can happen to infants when their arms or legs are hyper-extended past the normal range of motion.

7

¶17. Due to the number of broken bones Reeves had sustained during a seven-week period, Dr. Brownlee tested him for brittle bones. The tests showed, however, that Reeves had no genetic or metabolic predisposition for brittle or easily broken bones. Dr. Brownlee testified "to a reasonable degree of medical certainty" that Reeves's injuries were "not plausibly explained" by self-injury or accidental injury. She further testified that a benign or passive event failed to explain Reeves's injuries and that his fractures instead indicated physical abuse.

¶18. Following Dr. Brownlee's testimony, both parties rested. After considering all the testimony and evidence, the jury found Wigley guilty of felony child abuse. The circuit court sentenced Wigley to forty years in MDOC's custody with twenty-five years to serve, fifteen years suspended, and five years of post-release supervision. Aggrieved, Wigley appeals.

## DISCUSSION

### I. Sufficiency of the Evidence

¶19. Wigley argues that the State presented circumstantial evidence that only established he "was present at a time when [Reeves] was crying and that [Reeves's] arm was swollen that same day." Wigley claims that such evidence failed to show he actually caused "serious bodily harm" to Reeves and that he did so "intentionally, knowingly[,] or recklessly . . . ." Miss. Code Ann. § 97-5-39(2)(c)(iii) (Rev. 2020). As a result, Wigley asserts that insufficient evidence supported his conviction of felony child abuse.

¶20. We review de novo Wigley's challenge to the sufficiency of the evidence. *Brooks v.*

*State*, 402 So. 3d 787, 790 (¶7) (Miss. Ct. App. 2025). "[T]he relevant question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018)). We view the evidence "in the light most favorable to the State," and we give the State "all favorable inferences that can be reasonably drawn from the evidence presented at trial." *Id.* We only "reverse and render . . . when the facts point so overwhelmingly in favor of the defendant that reasonable men could not have found, beyond a reasonable doubt, the defendant was guilty." *Id.* (quoting *Jones v. State*, 991 So. 2d 629, 634 (¶11) (Miss. Ct. App. 2008)).

¶21.    In arguing that insufficient evidence supported his conviction, Wigley attempts to distinguish his case from *Hill v. State*, 17 So. 3d 1092 (Miss. Ct. App. 2009). Like Wigley, the defendant in *Hill* was convicted of one count of felony child abuse for injuries sustained by his nine-week-old son. *Id.* at 1094 (¶¶1-2). On appeal, Hill argued "that his conviction was based primarily on circumstantial evidence" and that the State presented insufficient evidence "to prove beyond a reasonable doubt that he was the person who" caused his son's injuries. *Id.* at 1098 (¶19).

¶22.    In considering Hill's argument on appeal, we noted the following evidence:

> Both doctors testified that [the nine-week-old son's] injuries could not have been self-inflicted, and that [his] injuries could only have been caused by a significant amount of force or trauma. Hill and [the mother] consistently testified that Hill was [the son's] sole caretaker during the day while [the mother] was working. There was no evidence that [the son] had been cared for by anyone else other than Hill and [the mother]. Both doctors testified that

9

some of [the son's] injuries were very recent. Finally, the Hills' neighbor testified that he heard a male voice, inferably Hill's, shout "shut up," a slapping sound, and the sound of a child crying emanating from the Hills' apartment.

*Id.* at (¶21). We determined that "[t]he combination of all of this evidence could easily lead a reasonable juror to conclude that Hill abused his nine-week-old son . . . ." *Id.* We therefore affirmed Hill's conviction and sentence for felony child abuse. *Id.*

¶23. Despite Wigley's attempts to distinguish the facts leading to his conviction from those in *Hill*, the State argues that the evidence presented in both cases is remarkably similar. Much like the doctors in *Hill*, Dr. Brownlee testified that Reeves's injuries strongly indicated child abuse and could not have been self-inflicted or caused by the explanations that Cantin originally offered to Lieutenant Rollison. Dr. Brownlee further testified to the traumatic force necessary to cause Reeves's various injuries. For example, she testified "a force into the bone and a twist" was needed to cause his fractured arm, "a direct blow to the chest or a severe squeezing of the chest" was required to cause his fractured ribs, and "a jerking or pulling motion" or a hyper extension of his legs was necessary to cause his leg fractures. She further testified that Reeves's fractured arm was a recent injury that only began to show signs of healing during the x-ray taken about a week after she examined him.

¶24. The trial testimony also reflected that Wigley was Reeves's sole caretaker at the time the arm fracture appeared to have occurred. According to Reeves's medical records, his pediatrician found no mobility issues with his extremities, including his arms, just a few days prior to the events of July 25, 2021. Brock similarly testified that she observed nothing of

concern when she babysat Reeves on the evening of July 24, 2021. Cantin also testified that Reeves appeared "[p]erfectly fine" when she and Wigley picked him up just after midnight from Brock's home.

¶25. When Pepper called Cantin on the morning of July 25, 2021, she heard no background noises—such as screaming or crying—to indicate Reeves was in distress. Cantin testified that Reeves was still sleeping when she left Wright's residence to drive to Pepper's house. The first evidence of Reeves's distress came when Wigley called Cantin and asked her to return to Wright's residence. Both Pepper and Cantin testified that Wigley was shouting. Wigley informed Cantin that he could not get Reeves to stop screaming and to calm down. When Cantin returned to Wright's residence, she could hear Reeves screaming as she exited her vehicle. Once inside, she immediately observed Reeves's swollen arm. As Brock had earlier testified, Wright was wheelchair bound and could not access the bedroom that Cantin and Wigley occupied. Thus, Wigley was the only person in the residence with access to Reeves at the time the seven-week-old baby began exhibiting signs of distress.

¶26. As in *Hill*, we find that based on "[t]he combination of all of this evidence[,]" a rational jury "could easily . . . conclude" that the State presented sufficient evidence to prove beyond a reasonable doubt that Wigley abused Reeves. *Hill*, 17 So. 3d at 1098 (¶21). Accordingly, we decline to reverse Wigley's conviction and sentence based on his claim of insufficient evidence.

## II. Ineffective Assistance of Counsel

11

¶27. Wigley also contends that his trial attorney rendered ineffective assistance of counsel. As this Court recently explained,

> [a] claim of ineffective assistance of counsel may be raised on direct appeal if such issues are based on facts fully apparent from the record. Generally, however, such claims are more appropriately brought during post-conviction proceedings. This Court will address such claims on direct appeal when [1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc., are not needed. In addition, we may address such claims on direct appeal when the record affirmatively shows that the claims are without merit.

*Rasberry v. State*, 405 So. 3d 1281, 1289 (¶28) (Miss. Ct. App. 2025) (citations, internal quotation marks, and footnote omitted).

¶28. Here, the parties stipulate that the record is adequate for this Court to consider Wigley's claims of ineffective assistance. Because we agree and find the record reflects that Wigley's claims ultimately fail, we address each of the arguments he raises on direct appeal. First, Wigley contends that his trial attorney failed to timely object to (and have stricken from the record) Cantin's testimony about the statements Wright made to her during their phone conversation on July 25, 2021. Second, Wigley argues that his trial attorney was constitutionally ineffective by failing to file a motion for a new trial.

¶29. To prove ineffective assistance of counsel, Wigley must establish both that (1) his trial attorney's performance was deficient and that (2) the deficiency prejudiced his defense. *Id.* at (¶29). "If either prong is not met, the claim fails." *Id.* (quoting *Havard v. State*, 928 So. 2d 771, 781 (¶8) (Miss. 2006)). "[C]ourts must 'indulge a strong presumption that counsel's

12

conduct falls within the wide range of reasonable professional assistance.' Therefore, 'the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Id.* at 1289-90 (¶30) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

### a. Cantin's Trial Testimony

¶30. On direct examination, Cantin explained that after her telephone conversations with Wigley on the morning of July 25, 2021, she called Wright. Cantin testified about certain statements Wright made during their conversation. Wigley particularly takes issue with Cantin's testimony that Wright stated "he couldn't get in the bedroom but that all he heard was the baby screaming." After Cantin testified about two additional statements Wright made during their telephone conversation, Wigley's attorney objected on the basis of hearsay. The circuit court sustained the objection and explained to Cantin that she could only testify about her personal observations, not statements made by someone else. As discussed, Wigley asserts on appeal that his trial attorney failed to timely object to the hearsay testimony and ask the circuit court to strike the testimony from the record and instruct the jury to disregard the testimony. Wigley contends that Cantin's testimony prejudiced him by allowing the jury to conclude that "Wigley was the only individual with access to [Reeves] at the alleged time of injury."

¶31. "[C]ounsel's choice of whether . . . [to] make certain objections fall within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." *Robinson*

13

*v. State*, 400 So. 3d 527, 532 (¶18) (Miss. Ct. App. 2025). As Wigley himself acknowledges, the jury had already heard Brock testify that Wright, who was wheelchair bound with bilateral amputation, could access his own bedroom and bathroom but not the secondary bedroom that Cantin and Wigley occupied. The jury also heard Cantin's testimony that when she left Wright's residence on the morning of July 25, 2021, Reeves was still asleep, while Wigley was awake and sitting in bed. Moreover, the jury heard ample testimony from Brock, Cantin, Pepper, and Dr. Brownlee to establish the approximate time of Reeves's arm injury and that he only began exhibiting signs of distress after Cantin left the house to pick up her daughter. Thus, based on our review of the record, we find Wigley not only failed to show that his trial attorney was deficient with regard to the admission of Cantin's testimony but also that any alleged deficiency resulted in prejudice to his defense.

### b.     Motion for a New Trial

¶32.    At the end of the State's case-in-chief, Wigley's attorney moved for a directed verdict and preserved for direct appeal Wigley's claims regarding the sufficiency of the evidence supporting his conviction and sentence. Following the trial, however, Wigley's attorney failed to file any post-trial motions, especially one seeking a new trial. According to Wigley, a reasonable probability existed that the circuit court would have granted a motion for a new trial after considering the weight of the evidence against the verdict. Wigley therefore alleges that his attorney's failure to file the post-trial motion not only precluded any challenges to the weight of the evidence but also amounted to ineffective assistance of

14

counsel.

¶33.    "The Mississippi Supreme Court has held that an attorney's failure to file post-trial motions challenging the weight and sufficiency of the evidence is deficient, satisfying the first prong of" the test for ineffective assistance. *Ford v. State*, 333 So. 3d 896, 915 (¶51) (Miss. Ct. App. 2022). Mississippi caselaw further holds, though, that "[c]ounsel's deficient performance in failing to file post-trial motions does not necessarily mean the defendant was prejudiced by the failure." *Id.* at (¶53). The errors that Wigley's attorney committed "must [have been] so serious as to deprive [Wigley] of a fair trial[,]" and "there must be a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different." *Id.* at (¶52) (citations and internal quotation marks omitted). With regard to Wigley's argument here, he must show a reasonable probability exists that the circuit court would have granted him a new trial had his attorney filed the motion. *See id.* at 916 (¶54).

¶34.    "When considering challenges to the weight of the evidence, 'we review the evidence in the light most favorable to the verdict and review the trial court's denial of a motion for a new trial under an abuse-of-discretion standard.'" *Pace v. State*, 369 So. 3d 588, 597 (¶33) (Miss. Ct. App. 2023) (quoting *Wayne v. State*, 337 So. 3d 704, 715 (¶39) (Miss. Ct. App. 2022)). Courts "will disturb a jury verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* (quoting *Wayne*, 337 So. 3d at 715 (¶39)).

¶35. As previously discussed, the State presented sufficient evidence for a jury to find beyond a reasonable doubt that Wigley abused Reeves. After "hear[ing] all the evidence, weigh[ing] the credibility of the witnesses, and resolv[ing] any conflicting evidence[,]" the jury convicted Wigley of felony child abuse. *Ford*, 333 So. 3d at 918 (¶64). Reviewing the evidence presented at Wigley's trial and doing so in a "light most favorable to the verdict[,]" we do not find that the verdict was "so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* We find no reasonable probability exists that the circuit court would have granted a motion for a new trial based on the weight of the evidence. Because Wigley cannot show that his attorney's deficient performance resulted in prejudice to him, we find this claim of ineffective assistance fails.

## CONCLUSION

¶36. We find that sufficient evidence supported Wigley's conviction and that he failed to show his trial attorney rendered deficient legal assistance that prejudiced him. We therefore affirm Wigley's conviction and sentence for felony child abuse.

¶37. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**